UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| MICHAEL DEAN NETHERTON, | |
| Plaintiff, | Case No. 3:15-cv-00186 |
| v. | Judge Trauger |
| | Magistrate Judge Newbern |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security,[1] | |
| Defendant. | |

To the Honorable Aleta A. Trauger, District Judge

## REPORT AND RECOMMENDATION

Pending before the court in this Social Security appeal is plaintiff Michael Dean Netherton's motion for judgment on the administrative record (Doc. No. 27), to which the Commissioner of Social Security has responded (Doc. No. 30). Netherton has filed a reply. (Doc. No. 31.) Upon consideration of these filings and the transcript of the administrative record (Doc. No. 16),[2] and for the reasons given below, the undersigned RECOMMENDS that Netherton's motion for judgment be DENIED and the decision of the administrative law judge be AFFIRMED.

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017, replacing Carolyn W. Colvin in that role. Berryhill is therefore appropriately substituted for Colvin as the defendant in this action, pursuant to Federal Rule of Civil Procedure 25(d) and 42 U.S.C. § 405(g).

[2] Referenced hereinafter by the abbreviation "Tr."

# I.    Introduction

Netherton filed an application for disability insurance benefits under Title II of the Social Security Act on October 18, 2010, alleging disability onset as of October 15, 2010, due to high blood pressure, degenerative disc disease, hepatitis C, severe arthritis, and cirrhosis of the liver. (Tr. 10, 131.) Tennessee Disability Determination Services (DDS) denied Netherton's claims upon initial review and again following his request for reconsideration. Netherton subsequently requested de novo review of his case by an administrative law judge (ALJ). The ALJ heard the case on June 24, 2013, and Netherton appeared with counsel and gave testimony. (Tr. 28–47.) A vocational expert (VE) also testified. At the conclusion of the hearing, the ALJ took the matter under advisement until August 27, 2013, when he issued a written decision finding Netherton not disabled. (Tr. 10–21.) That decision contains the following enumerated findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2015.

2. The claimant has not engaged in substantial gainful activity since October 15, 2010, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments: lumbar degenerative disc disease, hepatitis C, cirrhosis of the liver, and major depressive disorder (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he cannot more than occasionally climb, balance, stoop, kneel, crouch or crawl; must avoid concentrated exposure to extreme cold and hazardous work environments; and is unable to have more than frequent interaction with others.

6. The claimant is capable of performing past relevant work as a four-color stripper, lithographic plate maker. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

2

7.  The claimant has not been under a disability, as defined in the Social Security Act, from October 15, 2010, through the date of this decision (20 CFR 404.1520(f)).

(Tr. 12, 14, 16, 20.)

On December 21, 2014, the Appeals Council denied Netherton's request for review of the ALJ's decision (Tr. 2–4), rendering that decision final. This civil action seeking review was timely filed on February 26, 2015. 42 U.S.C. § 405(g).

## II.   Review of the Record

Netherton's brief (Doc. No. 28, PageID# 553–60) contains the following statement of facts:

Netherton was born in 1956, making him 54 years old at his alleged onset date and 57 years old at the date of the decision. Tr. 30, 128. He reported obtaining his GED in 1991 and completing training to be a four color stripper in December 1992. Tr. 20, 132. Netherton is insured for benefits under Title II until December 31, 2015. Tr. 12.

*Hearing Testimony*

At the hearing on June 24, 2013, Netherton testified he had worked for the same printing industry employer for about 25 years doing progressively different jobs including mail sorter, machine operator, lift driver, color stripper, and plate maker. Tr. 30–31. His back pain eventually became so bad that he is now unable to work. Tr. 31. He also experiences pain down his legs and in his left knee that makes it difficult to use stairs and has weakness and frequent urination from hepatitis C. Tr. 32–33. He has diminished grip strength in his right hand. Tr. 34. He uses a TENS unit on his back and leg two or three times per week and takes Percocet and Soma for pain. Tr. 34–35. His sister comes over to help with the laundry, make meals, and perform housework. Tr. 35–36. He can sit, stand, or walk for 15 to 20 minutes at one time and had to stand up during the hearing. Tr. 36. He testified he looked for jobs after being laid off by his previous employer, but did not know if he would actually be able to do the jobs he applied for. Tr. 40. He acknowledged receiving unemployment and stating in his application that he was ready and able to work, but he was uncertain whether he would actually be able to work during that time. Tr. 41–42.

The VE testified Netherton would be able to perform his past work as a four color stripper and lithographic plate maker with the limitations the ALJ incorporated into the RFC. Tr. 44. The VE testified that he would not be able to perform these jobs if he was unable to carry out complex or detailed instructions, but he would be able to perform other unskilled work such as production assembler, finisher, and pricing tagger. Tr. 44–45. The VE also testified that Netherton would be unable to perform

any of his past work if he was limited to never stooping or occasional use of the right hand. Tr. 45.

*Medical Evidence*

<u>Physical Impairments</u>

On December 3, 2009, Sharna Davenport, A.P.R.N., observed Netherton's spleen and liver were palpable and that he exhibited both a reddening of his hands and "spider veins." Tr. 201. Nurse Davenport indicated he might benefit from a more intense course of treatment for hepatitis C than the one that had previously failed. *Id*. An abdominal study from December 21, 2009 showed hepatic cirrhosis of the liver and splenomegaly as well as a tiny cyst in the liver. Tr. 196–97. On June 14, 2010, Netherton reported his low back pain was worsened by moving or standing up and he was experiencing tiredness. Tr. 215. Nigar Enayat, M.D., observed increased pain with movement and 1+ deep tendon reflexes bilaterally and prescribed Depo Medrol, Flexeril, and Mobic. *Id*. Dr. Enayat also provided him with paperwork to be excused from work for a week. *Id*. On June 16, 2010, Netherton reported that his back was not feeling any better and he had pain into his left leg with occasional tingling as well as tiredness. Tr. 214. Dr. Enayat observed 1+ deep tendon reflexes bilaterally and a positive straight leg raise and prescribed Naprosyn, Flexeril, and a Medrol dose pack. *Id*. An MRI taken on June 22, 2010 showed a minimal disc bulge at L1-L2, L5-S1 level degenerative disc disease with grade I anterolisthesis of L5 on S1 and protruding disc material with probable contact with the transiting L5 nerve roots bilaterally. Tr. 239–40.

On July 30, 2010, John Bacon, M.D., (whose treating notes are mostly illegible, but indicate he treated Netherton monthly from June 25, 2010 to January 17, 2011) opined [in support of Netherton's claim for employer-sponsored disability benefits] that it was indeterminate when Netherton would be able to return to work because of limitations related to severe low back pain and pain in his hips and thighs that was worsened with activity. Tr. 226–35. Dr. Bacon further opined that Netherton was unable to bend, lift, twist, climb, or engage in prolonged sitting, standing, or walking. Tr. 235. In a treatment note from this same date, Dr. Bacon noted that Netherton rated his level of pain on the best days as a 4/10 and a 10/10 on the worst. Tr. 232. On August 30, 2010, Dr. Bacon indicated Netherton's pain was a 3/10 at best and he had trouble with bending and lifting. Tr. 231. Dr. Bacon also indicated that his back impairment was "possibly surgical." *Id*.

Laboratory testing from October 11, 2010 showed elevated ALT and AST levels (used to assess liver damage or injury) as well as presence of the hepatitis C virus with a viral load of 1,385,894 IU/mL.[3] Tr. 206. Randy Howard, M.D., noted [that]

---

[3] Viral loads over 800,000 are considered high. Individuals with lower viral loads have a better chance of responding to treatment. *See* Brian L. Perlman, M.D., *Hepatitis C and Viral Load*, WEBMD, http://www.webmd.com/hepatitis/c-hcv-viral-load (last visited February 19, 2018).

4

Netherton reported occasional joint aches. Tr. 206. On November 1, 2010, Netherton again reported joint aches and Dr. Howard offered another course of hepatitis C treatment, but Netherton indicated he wanted to wait because he was losing his insurance. Tr. 210. Netherton went to the emergency room on March 7, 2011 due to a painful back injury. Tr. 439. Lane Smith, P.A., observed vertebral point tenderness over the mid and lower lumbar spine with tissue tenderness and moderately limited range of motion with flexion, extension, rotation, and lateral bending. Tr. 440. Physician's Assistant Smith advised him to refrain from lifting greater than ten pounds for the next two days. Tr. 441.

On April 21, 2011, consultative examiner Bruce Davis, M.D., observed upper abdominal tenderness, 3-4/5 grip strength in the hands, posterior neck pain, slow neck range of motion in the cervical spine, low back pain, tenderness in the low back with slow position changes, decreased range of motion in the lumbar spine, a diminished range of motion on seated and supine straight leg raising, incomplete squatting, a slow, painful, and unsteady gait, and slow heel, toe, and tandem walking. Tr. 242. Dr. Davis opined that Netherton was able to lift 20 pounds occasionally and ten frequently and carry 20 pounds or less occasionally due to weakness and fatigue from hepatitis C, hypertension, and the pain and limited range of motion in his cervical and lumbar spine. Tr. 244. Dr. Davis opined Netherton was limited to sitting for one hour at a time and for six hours total in an eight hour workday, standing or walking 30 minutes at one time and for four hours total, and could never engage in postural maneuvers like climbing, balancing, stooping, kneeling, crouching, or crawling. Tr. 245–46. Dr. Davis also opined Netherton was limited to occasional reaching, handling, fingering, feeling, pushing, and pulling due to neck pain, bilaterally reduced shoulder range of motion, and bilaterally weak hand grip. *Id.* Dr. Davis lastly opined that Netherton was limited to occasional exposure to moving mechanical parts, operating a motor vehicle, humidity, wetness, and pulmonary irritants and no exposure to unprotected heights, temperature extremes, vibrations, or chemicals which would damage the liver. Tr. 247–48.

An abdominal ultrasound from August 17, 2011 showed a prominence of the caudate lobe of the liver, a possible cyst in the liver, and that Netherton's spleen size was in the upper limits of normal. Tr. 281.

On September 8, 2011, Sarah Trent, A.N.P., observed [that] Netherton had 3/5 symmetric motor strength in his upper and lower extremities with jerking as well as moderately limited lumbar spine range of motion, moderate pain, and diffuse tenderness. Tr. 378. Nurse Practitioner Trent advised Netherton to continue Lortab and Soma for the pain with the goal to reduce it by 20 to 40 percent. *Id.* Nurse Practitioner Trent and other sources at Comprehensive Pain Specialists continued to provide pain management care until at least February 7, 2013. Tr. 339. The vast majority of these treatment notes contained evidence of only a short physical examination that did not include an assessment of musculoskeletal functioning related to the spine or motor strength. Tr. 340–79.

On October 6, 2011, Netherton reported to Raul Couret, M.D., that he tired easily and felt weak. Tr. 321. A nerve conduction study of the lower extremities performed on October 26, 2011 was normal. Tr. 433. On April 19, 2012, Netherton reported worsening pain in his left knee and Nurse Practitioner Trent observed the lateral joint line was mildly tender to palpation with crepitus. Tr. 257–58. On June 14, 2012, Netherton reported he had needed to take more of his medications due to poor pain control and increased pain in his knee. Tr. 353. Nurse Practitioner Trent observed mild tenderness to palpation over the joint line and guarded range of motion; she increased his dose of Lortab to help meet his increased pain needs. Tr. 354–55. On August 9, 2012, Netherton reported his knee pain was worst when he had to squat or bend. Tr. 349. An MRI of the left knee from November 7, 2012 showed a shallow partial thickness chondral defect of the medial femoral condyle and chronic partial tear of the ACL. Tr. 430. On December 6, 2012, Melissa Cooper, F.N.P., prescribed a knee brace and gave him samples of Voltaren gel for his knee. Tr. 345.

Imaging from December 2012 and January and February 2013 showed stable marked enlargement of the caudate lobe in the liver, cirrhosis, and a normal pancreas and spleen. Tr. 445–46, 451. On February 7, 2013, Amy Bowser, N.P., changed his pain medication to Percocet because Lortab was no longer effective. Tr. 340–41. On March 28, 2013, Netherton reported that Percocet provided relief and improvement in functioning, though he was one day short when he presented for his medication refills. Tr. 335. All urine drug screens in the record, however, show that Netherton was compliant with his medications and his pain management sources noted no aberrant behavior. Tr. 335, 382, 387.

Mental Impairments

On multiple occasions, treating physician Hailu Kabtimer, M.D., observed that Netherton appeared depressed on examination with monotonous speech and poor eye contact. Tr. 266 (April 26, 2011), 270 (May 10, 2011), 273 (August 10, 2011), 276 (August 24, 2011), 279 (September 21, 2011), 328 (February 21, 2012). Dr. Kabtimer prescribed Celexa 20 milligrams on April 26, 2011. Tr. 268. On August 10, 2011, Netherton reported that Celexa had been helping his depression "somewhat" and did not want to increase the dose. Tr. 272. By August 24, 2011, Netherton reported Celexa was not helping as much and he requested an increase in the dose. Tr. 275. Dr. Kabtimer doubled the dose to 40 milligrams. Tr. 276. On September 21, 2011, Netherton reported that the increase in Celexa had not helped but he was reluctant to change to a different medication, so Dr. Kabtimer continued Celexa at the increased dose. Tr. 278–79. Netherton reported "feeling down" a lot and Dr. Kabtimer advised him to seek care with a mental health clinic. Tr. 278. On November 21, 2011, Dr. Kabtimer refilled his Celexa. Tr. 333–34.

On December 29, 2011, Netherton reported to consultative examiner Michael Loftin, Ph.D., that he was experiencing symptoms such as decreased appetite,

decreased sleep from stress-related thoughts at night, depressed and anxious mood, negativistic thinking, and occasional crying spells. Tr. 300. Dr. Loftin observed he was able to complete 5/6 serial three answers correctly, but struggled with the digit span task, could not spell "world" backwards, and could only recall 2/3 words after a three minute delay. Tr. 301. Dr. Loftin opined Netherton appeared to be in the low average range of intellectual functioning, had mild impairment in short term memory, mild impairment in sustaining concentration, mild-to-moderate impairment in social relating, and a mild-to-moderate impairment in the ability to adapt to change. Tr. 301–02.

On January 10, 2012, State Agency psychological consultant Pilar Vargas, M.D., opined that, based on review of the record up to that point, Netherton had mild limitations in activities of daily living and social functioning and a moderate limitation in maintaining concentration, persistence, and pace. Tr. 313. Dr. Vargas specifically supported this assessment by noting that the mental status examination performed by Dr. Loftin was more consistent with a moderate impairment in concentration, persistence, and pace. Tr. 315. Dr. Vargas more specifically found moderate limitations in abilities to maintain attention and concentration for extended periods; complete a normal workday or workweek without interruption from psychologically based symptoms and perform at a consistent pace; and respond appropriately to changes in the work setting. Tr. 317–18.

(Doc. No. 28, PageID# 553–60.)

## III.    Analysis

### A.    Legal Standard

Judicial review of "any final decision of the Commissioner of Social Security made after a hearing" is authorized by the Social Security Act, which empowers the district court "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). This Court reviews the final decision of the ALJ to determine whether substantial evidence supports the ALJ's findings and whether the correct legal standards were applied. *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 833 (6th Cir. 2016). "Substantial evidence is less than a preponderance but more than a scintilla; it refers to relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Gentry v. Comm'r of Soc.*

7

*Sec.*, 741 F.3d 708, 722 (6th Cir. 2014). The Court also reviews the decision for procedural fairness. "The Social Security Administration has established rules for how an ALJ must evaluate a disability claim and has made promises to disability applicants as to how their claims and medical evidence will be reviewed." *Id.* at 723. Failure to follow agency rules and regulations, therefore, "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Id.* (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)).

The ALJ's decision must stand if substantial evidence supports it, even if the record contains evidence supporting the opposite conclusion. *See Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 473 (6th Cir. 2016) (citing *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). This Court may not "try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012) (quoting *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)). "However, a substantiality of evidence evaluation does not permit a selective reading of the record . . . [but] 'must take into account whatever in the record fairly detracts from its weight.'" *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 641 (6th Cir. 2013) (quoting *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984)).

### B. The Five-Step Inquiry

The claimant bears the ultimate burden of establishing an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable

8

clinical and laboratory diagnostic techniques." *Id.* § 423(d)(3). The agency considers a claimant's

case under a five-step sequential evaluation process, as follows:

1. A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.

2. A claimant who does not have a severe impairment will not be found to be disabled.

3. A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.

4. A claimant who can perform work that he has done in the past will not be found to be disabled.

5. If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

*Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 835 n.6 (6th Cir. 2016); 20 C.F.R. §§ 404.1520,

416.920. The claimant bears the burden through step four of proving the existence and severity of

the limitations her impairments cause and the fact that she cannot perform past relevant work;

however, at step five, the burden shifts to the Commissioner to "identify a significant number of

jobs in the economy that accommodate the claimant's residual functional capacity and vocational

profile." *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011).

When determining a claimant's residual functional capacity (RFC) at steps four and five,

the ALJ must consider the combined effect of all the claimant's impairments, mental and physical,

exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. § 423(d)(2)(B), (5)(B); *Glenn*

*v. Comm'r of Soc. Sec.*, 763 F.3d 494, 499 (6th Cir. 2014) (citing 20 C.F.R. § 404.1545(e)). The

agency can carry its burden at the fifth step of the evaluation process by relying on the Medical-

Vocational Guidelines, otherwise known as "the grids," but only if a nonexertional impairment

9

does not significantly limit the claimant, and then only when the claimant's characteristics precisely match the characteristics of the applicable grid rule. *See Anderson v. Comm'r of Soc. Sec.*, 406 F. App'x 32, 35 (6th Cir. 2010); *Wright v. Massanari*, 321 F.3d 611, 615–16 (6th Cir. 2003). Otherwise, the grids function only as a guide to the disability determination. *Wright*, 321 F.3d at 615–16; *see also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990). Where the grids do not direct a conclusion as to the claimant's disability, the agency must rebut the claimant's prima facie case with proof of the claimant's individual vocational qualifications to perform specific jobs, typically through vocational expert testimony. *Anderson*, 406 F. App'x at 35; *see Wright*, 321 F.3d at 616 (quoting SSR 83-12, 1983 WL 31253, *4 (Jan. 1, 1983)).

### C. Netherton's Statement of Errors

#### 1. The physical RFC finding

Netherton first argues that the ALJ erred in assigning little weight to the opinion of consultative examiner Dr. Davis in reaching his determination of Netherton's RFC for a limited range of light exertional work. Netherton argues that the ALJ's reasons for discounting Dr. Davis's opinion are either unsupported by the record or inconsistent with the regulatory standards for reviewing opinion evidence contained in 20 C.F.R. § 404.1527(c). Netherton asserts that Dr. Davis's opinion is consistent with the restrictions imposed by treating physician Dr. Bacon. He further argues that ALJ did not follow the treating physician rule, 20 C.F.R. § 404.1527(c)(2),[4] because the ALJ rejected Dr. Bacon's opinion without giving good reasons in support.

---

[4]     Section 404.1527(c)(2) provides:

    Generally, we give more weight to medical opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such

The ALJ provided the following discussion of the opinion evidence:

The medical evidence supports the existence of a severe condition due to lumbar problems with lumbar degenerative disc disease. The MRI dated June 22, 2010 shows protruding disc material and probable contact with the transiting LS nerve roots bilaterally (Exhibit 4F, page 15). Despite this condition, the claimant had been working and testified that his back was beginning to bother him when he was laid off in October 2010. However, the medical records show that on July 28, 2010 his treating physician, Dr. Bacon, provided a form to MetLife Disability indicating the claimant was unable to work for an undermined amount of time due to low back pain, and pain in the hips and thighs (Exhibit 4F, page 10). It stated no bending, twisting, lifting, climbing or prolonged sitting standing or walking. Dr. Bacon also stated that the claimant should remain out of work for 3 weeks (Exhibit 4F, page 9), and should remain out of work from June 25, 2011 to July 9, 2011 (Exhibit 4F, page 14).

The claimant continued to see Dr. Bacon through January 2011 but there are no additional notes regarding limitations, disability, or continued release from work (Exhibit 4F). The claimant's treating physician Dr. Enayet examined the claimant and recorded that on September 22, 2010 the claimant had full spinal range of motion and full strength (Exhibit 3F, page 3). The claimant saw Dr. Kabtimer on April 26, May 10, August 10, August 24 and September 21, 2011. The records reflect that the claimant had no musculoskeletal complaints and that the claimant's spine and musculoskeletal system were examined and found to be without defect.

* * *

As for the opinion evidence, with regard to the treating source opinion of Dr. Bacon at Exhibit 4F, this is an opinion reserved to the Commissioner of Social Security, see SSR 96-5p, and it appears to have been a temporary release rather than permanent (Exhibit 4F). I specifically considered the treatment records from Dr. Kabtimer, which included his repeated observations regarding the claimant's good general state of health, including good appetite and exercise tolerance. These

---

as consultative examinations or brief hospitalizations. If we find that a treating source's medical opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's medical opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the medical opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's medical opinion.

20 C.F.R. § 404.1527(c)(2).

observations are accepted as standing for the proposition that the claimant does not have limitations above or beyond those indicated in the above residual functional capacity.

Dr. Bruce Davis, a [consultative examination] provider, opined that claimant could perform light work, but had a multitude of non-exertional limitations, which included a complete inability to stoop (Exhibit 5F). I do not accept those opinions to be fully credible most notably because a complete inability to stoop (bend the body downward and forward by bending the spine at the waist, Social Security Ruling 85-15) would be inconsistent with my observation that claimant was able to assume a seated position during his hearing. In addition, the consulting physician saw claimant just once and appears not to have reviewed any of claimant's treatment records. For the most part, the consulting physician did not refer to specific abnormal medical findings supporting his opinions. I assign little weight to this opinion.

(Tr. 17–19.)

Regarding Dr. Bacon's opinion, Netherton is correct that, "in all cases there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician is entitled to great deference," and that good reasons "supported by the evidence in the case record" must be identified if the ALJ decides not to afford the treating physician's opinion great weight. (Doc. No. 28, PageID# 568) (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406–07 (6th Cir. 2009) and *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007)). Dr. Bacon opined that Netherton was precluded from working by his severe radiating low back pain which resulted in an inability to bend, lift, twist, or climb, as well as an inability to engage in prolonged sitting, standing, or walking. (Tr. 235.) In explaining his reasons for not accepting Dr. Bacon's opinion, the ALJ appropriately noted (1) the conflicting medical evidence from treating physician Dr. Kabtimer; (2) the apparently temporary nature of the restrictions and supporting treatment notes given at intervals by Dr. Bacon to MetLife Disability (Tr. 235, 238); and (3) the fact that Dr. Bacon excused Netherton from work for three weeks based on his July 9, 2010 office visit, then later cited that visit as grounds for his opinion that he could not estimate Netherton's "Return to Work Date."

12

(*Compare* Tr. 233 *with* Tr. 235.) Further, Dr. Bacon's opinion that Netherton was precluded from work for an indeterminable time was properly found to be an opinion on the ultimate legal issue of disability. It was therefore appropriately disregarded pursuant to Social Security Ruling (SSR) 96-5p, 1996 WL 374183 (July 2, 1996). *See also* 20 C.F.R. § 404.1527(d). The ALJ had also noted the robust list of daily activities that Netherton reported to the agency on February 2, 2011 (Tr. 147–54), which included "car[ing] for his special needs daughter from the time she wakes up until she goes to bed . . . [,] tak[ing] her to school, fix[ing] her meals, driv[ing], and shop[ping]." (Tr. 15.) The undersigned finds that the ALJ properly weighed Dr. Bacon's opinion and provided good reasons for varying from it, even though it is consistent in some respects with the opinion of the consultative examiner, Dr. Davis.

An ALJ is not required to give good reasons for rejecting the opinion of a one-time consultant such as Dr. Davis. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010) (citing *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007)). Nonetheless, the ALJ identified several reasons for giving little weight to Dr. Davis's opinion: its inconsistency with the ALJ's observations of Netherton at the hearing, the fact that Dr. Davis only examined Netherton once and did not have the benefit of reviewing his treatment records, and the fact that Dr. Davis did not support his assessment of extremely limited postural abilities with any particular associated medical findings. (Tr. 18–19.) While Netherton argues that the ALJ's equation of stooping (defined by the ALJ as "bend[ing] the body downward and forward by bending the spine at the waist") and sitting is not an apt one inasmuch as "[t]he mechanics of sitting down require an individual to bend at the knees and hips, but not at the anatomical waist" (Doc. No. 28, PageID# 562), the ALJ explicitly relied on the postural movements that he witnessed Netherton performing, which may not have conformed to textbook definitions. The ALJ was entitled to rely on his own

13

observation of Netherton's ability "to assume a seated position during his hearing" as demonstrating some ability to bend his body "downward and forward by bending the spine at the waist" (Tr. 19) as contradicting the narrow restriction against stooping within Dr. Davis's assessment.[5] *See Moon v. Sullivan*, 923 F.2d 1175, 1183 (6th Cir. 1990) ("[T]he ALJ may distrust a claimant's allegations of disabling symptomatology if the subjective allegations, the ALJ's personal observations, and the objective medical evidence contradict each other.").

Even if the comparison between sitting and stooping was unreasonable, the ALJ otherwise sufficiently explained his weighing of Dr. Davis's opinion. While Netherton argues in his reply brief (Doc. No. 31, PageID# 610–11) that the Sixth Circuit's decision in *Gayheart v. Commissioner of Social Security*, 710 F.3d 365 (6th Cir. 2013), requires the ALJ's rejection of a consultative examiner's opinion be more carefully scrutinized than under prior Circuit precedent, the Court reads that decision differently. *Gayheart* rightly explained that the regulations direct the application of "progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." 710 F.3d at 375. However, that case was principally concerned with the glossing over of defects in consulting physicians' opinions only to apply "greater scrutiny to a treating-source opinion as a means to justify giving such an opinion

---

[5]     Netherton asserts that, "given that the ALJ relied solely on his observation that Netherton was able to sit down at the hearing as the basis for wholly rejecting Dr. Davis' stooping opinion, he arguably violated the Sixth Circuit's well-established prohibition of using a 'sit and squirm' test to determine that an individual is not disabled." (Doc. No. 28, PageID# 562 (citing *Weaver v. Sec'y of Health & Human Servs.*, 722 F.2d 310, 312 (6th Cir. 1983).) This argument is without merit.  The *Weaver* court held that an ALJ cannot dismiss "a claim for pain solely on the ALJ's observations at the hearing;" rather, the ALJ "must cite *some* other evidence for denying a claim for pain in addition to personal observation." *Weaver*, 722 F.2d at 312 (emphasis original). This holding does not prevent determining the viability of one postural restriction among many based on the ALJ's personal observation. In any event, the limitation against stooping is among the postural restrictions for which the ALJ noted that "specific abnormal medical findings supporting [Dr. Davis's] opinions" were not provided (Tr. 19); the ALJ thus relied on more than just his own observations to reject this portion of the opinion.

14

little weight." 710 F.3d at 379–80. The *Gayheart* court did not purport to give any new interpretation to what the regulations require of an ALJ weighing a consultative examiner's opinion, but simply emphasized that the regulatory standard for weighing such opinions "based on the examining relationship (or lack thereof), specialization, consistency [with the record as a whole], and supportability [by clinical and laboratory findings identified by the examiner]" must be applied with at least as much rigor as the ALJ applies in considering a competing opinion from a treating physician. *Gayheart*, 710 F.3d at 376, 379–80 (citing 20 C.F.R. § 404.1527(c)).

Here, the ALJ recognized the appropriate standard for considering opinion evidence (Tr. 16), and applied that standard in weighing Dr. Davis's opinion by considering that Dr. Davis only examined Netherton once, that his assessment of an inability to stoop was inconsistent with Netherton's posture at the hearing, and that Dr. Davis did not support his opinion restricting postural movements with specific clinical findings suggesting such extreme restrictions. "[T]he examining relationship . . . consistency, and supportability" were all accounted for. *Gayheart*, 710 F.3d at 376. Substantial evidence therefore supports this assignment of little weight to Dr. Davis's opinion, which, again, did not require any statement of "good reasons" for finding that it would not control the RFC determination. *Id.* (finding that "opinions from nontreating and nonexamining sources are never assessed for 'controlling weight'" and therefore do not require that variance from them be carefully explained, as do opinions from treating sources). The Court finds no error here.

### 2. The mental RFC finding

Netherton's next argument concerns the opinions of nontreating sources as to his mental functioning. He disputes the adequacy of the ALJ's rationale for the weight given the opinions of consultative psychological examiner Dr. Loftin and nonexamining consultant Dr. Vargas. He claims that reversal is warranted due to the ALJ's error in (1) accepting Dr. Loftin's assessment of

"mild to moderate impairment in his social relating" because such impairment was consistent with Dr. Loftin's examination report, but failing to explicitly accept or reject Dr. Loftin's assessment that Netherton "appear[ed] to be mildly to moderately impaired in his ability to adapt to change" (Tr. 302), and (2) dismissing Dr. Vargas's opinion to the extent it differs from Dr. Loftin's opinion, based on the fact that Dr. Loftin examined Netherton while Dr. Vargas did not. As to Netherton's second argument, the ALJ's decision to give greater weight to the examining psychologist, Dr. Loftin, than to the nonexamining mental health consultant, Dr. Vargas, is plainly not erroneous. *See* 20 C.F.R. § 404.1527(c)(1) ("Generally, we give more weight to the medical opinion of a source who has examined you than to the medical opinion of a medical source who has not examined you."). Although Netherton argues that "the ALJ did not provide any actual explanation for the weight he afforded [Dr. Vargas's] opinion" (Doc. No. 28, PageID# 567), the routine application of a presumption in favor of examiners' opinions is appropriate here, where Dr. Vargas's assessment of "more indication[s] of moderate impairment" is based on his interpretation of the mental status examination results obtained by Dr. Loftin. (Tr. 315.) The examiner's ability to see the claimant's response to the examination is the very reason for the presumption.

Regarding the ALJ's accounting for the effect of the mild-to-moderate limitation in Netherton's ability to adapt to change in the same way as he accounted for the assessment of mild-to-moderate limitation in social functioning, Netherton fails to discern the difference in the ALJ's weighing of these two assessments by Dr. Loftin. The ALJ found that the evidence of record, including Dr. Loftin's report, established moderate difficulties in social functioning. He therefore implicitly rejected Dr. Loftin's assessment insofar as it established less-than-moderate difficulties:

> In social functioning, the following information supports moderate difficulties in social functioning. He reports that he is able to go to church twice a week and that he is able to go shopping (Exhibit 4E). He reports he gets along with authority figures and has never lost a job due to problems getting along with people (Exhibit

16

4E). However, the claimant states he was "kicked out" of the Marine Corps and that he is lacking social support (Exhibit 11F). The psychiatric exam report of Dr. Loftin, states that the claimant is mildly to moderately impaired in his social relating and ability to adapt to change (Exhibit 11F).

* * *

I accept the opinion of this consulting psychologist that claimant has moderate social limitations as that opinion is consistent with the claimant's presentation during the examination (Ex. 11F). . . .

(Tr. 15, 19.) Accordingly, the ALJ included in his RFC finding a limitation against more than frequent interaction with others. (Tr. 16.)

However, the ALJ did not view the record as supporting the existence of moderate functional limitations in Netherton's ability to adapt, despite Dr. Loftin's assessment that such limitations could rise to the moderate level. The ALJ's review of the evidence of loss of mental function included the following:

In activities of daily living, the evidence shows that the claimant has a mild restriction. The Social Security Agency form-3373 function report submitted by the claimant on February 2, 2011, states that he is able to care for his special needs daughter from the time she wakes up until she goes to bed. He takes her to school, fixes her meals, drives, and shops. . . . As for episodes of decompensation, the claimant has experienced no episodes of decompensation, which have been of extended duration.

(Tr. 15–16.) The Government argues that "the 'mild to moderate' comment does not describe a particularly serious condition" that would warrant any corresponding functional restriction. (Doc. No. 30, PageID# 598.) Case law supports this proposition to the extent that mild limitations are regarded as indicative of a nonsevere impairment and therefore do not have to be included in the ALJ's RFC finding or the questions to the vocational expert. *See Johnson v. Comm'r of Soc. Sec.*, No. 2:13-cv-0105, 2013 WL 6062147, at *8–9 (S.D. Ohio Nov. 18, 2013) (finding that "the case law strongly suggests that if a mental impairment is deemed not to be severe on the ground that it imposes, at most, only mild limitations in certain areas of functioning, an ALJ may omit reference

of those limitations in the hypothetical question posed to the vocational expert"), *adopted by* No. 2:13-cv-105, 2014 WL 497428 (S.D. Ohio Feb. 7, 2014).

In light of the ALJ's recognition that Dr. Loftin assessed "mild to moderate" limitations in adaptation as well as social functioning and his finding that only the social functioning limitations proved to be moderate when considered in light of the other record evidence, it appears to the Court that the ALJ determined that Netherton's ability to adapt was less than moderately limited. *Cf. Taylor v. Comm'r of Soc. Sec.*, No. 12-12855, 2013 WL 5348818, at *3 (E.D. Mich. Sept. 24, 2013) (noting the distinction between "cases in which a medical expert has found a moderate limitation . . . and those where the ALJ found such a limitation" and finding that only where "the ALJ has found such a limitation, . . . must [the ALJ] incorporate these limitations into the hypothetical questions"). Considering Netherton's report that he could attend to the daily care of his special needs daughter and the ALJ's concerns with Netherton's overall credibility, the Court finds substantial support for the ALJ's finding that Netherton's social limitation was his only vocationally relevant mental limitation. Dr. Loftin is a nontreating source, and the ALJ appears to have weighed Dr. Loftin's assessments of Netherton's functional loss in consideration of the other evidence of record. The Court finds no error here.

### 3. Credibility

Netherton argues that the ALJ's credibility finding is not supported by substantial evidence. In determining that Netherton's allegations of disabling pain were not fully credible, the ALJ found that the daily activities described in a February 2011 statement by Netherton—including driving, shopping, preparing meals, and caring for his teenaged daughter—were inconsistent with his testimony at the hearing, in which he described his inability to perform, and need for assistance with, any household chores or meal preparation and some self-care tasks. (Tr. 15.) The ALJ

concluded that "[t]he daily activities described by the claimant are not as limiting as one would expect given the complaints of disabling symptoms and limitations." (Tr. 15.) The ALJ further discussed Netherton's hearing testimony and other factors in the credibility analysis, as follows:

> The claimant testified that his back was beginning to bother him when he was laid off from his last job in October 2010. He reports that he has back pain, which radiates to both legs and sometimes to his arms. He is weak all the time. He frequently wears a knee brace. Claimant uses a TENS unit several times each week. He cannot grip anything with his right hand. Claimant lives with his 16-year-old daughter and he does no housework of any kind. He cannot sit or stand for more than 20 minutes at a time. Claimant received unemployment benefits after being laid off and continuing until the middle of 2012. He told the unemployment agency that he was able to work, but he testified that he had no idea what he meant by that statement. Furthermore, the claimant stated to the consultative examiner, Michael Loftin Ph.D., he is worried "because I can't find a job making what I used to make." This implies that the claimant believes he can work and that he has tried to find suitable employment. Although the inconsistent information provided by the claimant may not be the result of a conscious intention to mislead, nevertheless the inconsistencies suggest that the information provided by the claimant generally may not be entirely reliable.

(Tr. 17.) Finally, the ALJ noted the multiple records from Netherton's treating physicians that included reports of no abnormalities on examination or even complaints of pain in his back or extremities, as well as the fact that, "[f]rom the time the claimant was being treated for hepatitis C and cirrhosis, he was able to continue working. It was only after he was laid off that . . . he alleged it to be disabling." (Tr. 18.)

Netherton argues that the ALJ attached too much significance to the statement that he could not find a job "making what he used to make"; that it was unclear how much significance the ALJ ascribed to Netherton's receipt of unemployment benefits; and that the ALJ took a one-sided view of the medical evidence, citing the objective reports that were unfavorable to Netherton's disability claim without discussion of the evidence that supports his claim or his excellent work history that bolstered his credibility. Netherton further challenges the ALJ's perception of an inconsistency between his statement that he was able to care for his daughter and his testimony that his daughter

19

had to care for him, pointing out that Netherton actually testified that his sister, not his daughter, was the one who helped with chores such as laundry, sweeping, and meal preparation. (Tr. 35–36.) Of course, regardless of who was providing the assistance, inconsistencies remain among Netherton's statements as to his abilities or the lack thereof and in the medical findings and notes of Netherton's symptom complaints. It is the province of the ALJ to weigh such conflicting evidence, with the resulting credibility determination due great deference on judicial review. *See*, *e.g.*, *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Id.* Here, the ALJ sufficiently explained his view of the aforementioned inconsistencies as justifying the finding that, although Netherton's impairments limited him to a range of light work, his claim of disabling limitations was not entirely credible. Such credibility determinations, grounded in the evidence, are "virtually unchallengeable." *Ritchie v. Comm'r of Soc. Sec.*, 540 F. App'x 508, 511 (6th Cir. 2013) (citation and internal quotation marks omitted). The Court finds no reason to disturb the ALJ's credibility determination in this case.

### 4. Evidence of ability to return to past relevant work

Finally, Netherton argues that the ALJ's step four finding that Netherton could return to his past relevant work is undermined by the ALJ's failure to include in his hypothetical question to the vocational expert limitations assessed by Drs. Davis, Loftin, and Vargas, as detailed above. For the reasons already discussed related to the ALJ's weighing of those opinions, the Court finds no merit in this argument. "[T]he ALJ is only required to incorporate into the hypothetical questions those limitations that have [properly] been accepted as credible, and is not obligated to include unsubstantiated complaints and restrictions in his hypothetical questions." *Keeton v.*

*Comm'r of Soc. Sec.*, 583 F. App'x 515, 533 (6th Cir. 2014) (citations and internal quotation marks omitted). Substantial evidence supports the ALJ's step-four finding that Netherton could return to his past relevant work and thus is not disabled.

## IV.     Conclusion

For these reasons, the undersigned RECOMMENDS that Netherton's motion for judgment on the administrative record (Doc. No. 27) be DENIED and the decision of the Commissioner be AFFIRMED.

Any party has fourteen days after being served with this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have fourteen days after being served with a copy thereof in which to file any responses to said objections.  Fed. R. Civ. P. 72(b)(2).  Failure to file specific objections within fourteen days of receipt of this Report and Recommendation can constitute a waiver of further appeal of the matters disposed of therein.  *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004).

ENTERED this 20th day of February, 2018.

Alistair E. Newbern
U.S. Magistrate Judge

21